# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANTHONY BROCUGLIO, SR.,
     Plaintiff,

     v.

WILLIAM PROULX, ET AL.,
     Defendants.

CIVIL ACTION NO.
3:99cv1888 (SRU)

## RULING ON MOTION FOR NEW TRIAL

In September 1999, Anthony Brocuglio brought a lawsuit against the Town of East

Hartford ("the Town"), the Town's mayor, deputy mayor, police chief, and three police officers,

alleging numerous violations of his civil rights. Brocuglio's claims arose out of an incident on

September 27, 1996, when Officers William Proulx and James O'Connor went to Brocuglio's

home, accompanied by a police dog, to ticket abandoned vehicles. That visit culminated in an

altercation between Brocuglio and the officers. In January 2002, I granted summary judgment in

favor of Brocuglio on his unreasonable search claim, and on October 18, 2005, following a jury

trial, the jury awarded Brocuglio nominal damages of twenty dollars on that claim. The jury

returned a verdict in favor of defendants on all other counts.

Brocuglio has filed a motion for a new trial. For the reasons that follow, the motion is

denied.

## I.      Standard of Review

Brocuglio has filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of

Civil Procedure. Rule 59(a) provides that, "[a] new trial may be granted to all or any of the

parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for

any of the reasons for which new trials have heretofore been granted in actions at law in the

courts of the United States . . . ." The Second Circuit has held that, "a motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice.'" *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)). In considering a motion for a new trial, a trial judge can weigh the evidence himself. *Id.* A motion for a new trial might be based on an argument that the trial was unfair to the moving party or that there was an error in the jury instructions. *Charts v. Nationwide Mutual Insurance Co.*, 397 F. Supp. 2d 357, 374 (D. Conn. 2005) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). A court should only grant a Rule 59 motion, however, if the jury's verdict was egregious. *Charts*, 397 F. Supp. 2d at 374 (citing *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)).

## II.    Discussion

Brocuglio seeks a new trial based upon various theories, all of which are problematic. With respect to my instructions to the jury, Brocuglio raises an argument he failed to raise distinctly until filing his post-trial motion, and based upon legal principles not supported by the factual record. In addition, his arguments regarding rulings I made during trial are unclear because he either fails to cite the record or does so erroneously. In sum, notwithstanding the theories that Brocuglio now advances, the verdict in this case was not a miscarriage of justice, and, therefore, a new trial is not appropriate.

### A.    Jury Instructions

Brocuglio complains that my instructions to the jury regarding his claims of unlawful arrest and excessive force against Proulx, O'Connor, and Egan were incorrect as a matter of law

for the following reasons: (1) I did not adopt Brocuglio's request to instruct the jury that the officers could not have based probable cause on conduct not rising to the level of assault; (2) my instruction regarding Brocuglio's limited common law right to resist arrest was wrong; (3) I did not instruct the jury that the officers could not have arrested Brocuglio lawfully in the curtilage without a warrant; (4) I did not instruct the jury that because Proulx and O'Connor were unlawfully present in the back yard, Brocuglio's arrest was unlawful, and therefore any degree of force used to effect that arrest was excessive; and (5) the undisputed evidence at trial showed that defendants arrested Brocuglio based on his conduct in the back yard, and therefore I should have only instructed the jury about the law with respect to actions occurring in the back yard. Those arguments depend, in large part, on the same legal theory – that is, that it would be unlawful for the defendants to have arrested Brocuglio in the curtilage without a warrant, unless, while defendants were unlawfully present in the back yard, Brocuglio's conduct in the back yard amounted to assault on a police officer, which would entitle the officers to arrest him even if they were unlawfully present in the first instance.

There is no question that Proulx and O'Connor violated Brocuglio's right to be free from unreasonable searches and seizures when they entered the curtilage for the purpose of ticketing allegedly abandoned vehicles as part of the process of seizing the vehicles. That is why, in January 2002, I granted Brocuglio's motion for summary judgment on his unreasonable search and seizure claim with respect to the vehicles. That is also why I have denied the defendants' motion for reconsideration with respect to that claim. Ruling on Defendants' Motion for Reconsideration (March 23, 2007). Proulx and O'Connor are liable to Brocuglio for the unreasonable search and seizure of the vehicles, and the jury awarded Brocuglio nominal

damages of twenty dollars on that claim.

Brocuglio contends that I should not have instructed the jury that it could find his arrest lawful if the defendants had probable cause to arrest him for his actions *either* in the back yard or in the front yard. Brocuglio argues that, if the arrest was premised upon conduct in the front yard, the defendants would have been required to obtain a warrant before arresting Brocuglio in the curtilage. That argument ignores the unique facts of this case:

When Proulx and O'Connor arrived at Brocuglio's home, they initially confined their activities to the public spaces in front of Brocuglio's home. While in the public areas, Proulx, O'Connor, and Brocuglio had an altercation, during which Brocuglio engaged in conduct that arguably provided the basis for probable cause to arrest him for breach of peace, interfering with an officer, or threatening an officer. *See* Conn. Gen. Stat. § 53a-181; Conn. Gen. Stat. § 53a-167a; Conn. Gen. Stat. § 53a-62. Indeed, there was evidence at trial that Brocuglio brought his dog, a pit bull, out of his home and into the front yard, and threatened the defendants. Proulx and O'Connor did not immediately arrest Brocuglio. Brocuglio re-entered into his home, after which there was a great deal of commotion in the home, including violent dog barking, screaming, yelling, and use of a great deal of profanity. Based on the evidence at trial, including tape recordings of the event, Brocuglio's conduct could reasonably be characterized as unpredictable and volatile.

While Brocuglio was still inside his house, Proulx and O'Connor entered the back yard for the purpose of ticketing abandoned vehicles, not for the purpose of arresting Brocuglio. There was no evidence at all to support a theory that Proulx and O'Connor entered the back yard based upon anything that happened in the front yard. Rather, as Brocuglio stipulated in the joint

-4-

pre-trial memorandum, *see* doc. #100 at 59, the evidence clearly established that Proulx and

O'Connor went to Brocuglio's home initially to ticket abandoned vehicles; the events in the front

yard simply delayed the ticketing for a brief period of time.  I have already ruled that the ticketing

in the back yard constituted an unreasonable search and seizure due to Proulx and O'Connor's

warrantless entry into the curtilage for the purpose of ticketing and ultimately seizing those

vehicles.  *See* Jan. 30, 2002 Trans. (doc. #42); Ruling on Defendants' Motion for

Reconsideration (March 23, 2007).  While the defendants were ticketing vehicles in the back

yard, Brocuglio emerged from his house into the back yard.  There, Brocuglio had another

altercation with Proulx and O'Connor, during which the officers arrested Brocuglio.  During the

altercation in the back yard, Brocuglio engaged in conduct that the jury could have found

provided the basis for probable cause to arrest him for assault of the officers.

Those unique facts result in a situation in which Proulx and O'Connor committed an

unlawful search and seizure with respect to the vehicles parked within Brocuglio's curtilage, but

where the arrest of Brocuglio in the curtilage was lawful.  *See generally* 3 WAYNE R. LAFAVE,

SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.1(b) (4th ed. 2004)

("LAFAVE") (discussing the distinct rights at issue between arrests and searches).  From 1999,

when this case was filed, until 2005, when the case went to trial, Brocuglio's theory of the case

was that Proulx and O'Connor entered the back yard, i.e., the curtilage, unlawfully, for the

purpose of ticketing abandoned vehicles.  *See, e.g.*, Second Amended Complaint ¶¶ 17-22 (doc. #

84).  Brocuglio further theorized that the defendants then trumped up charges against Brocuglio,

so that they could arrest him, in effect, to cover up the unlawful search and seizure of the

vehicles.  *Id.* ¶ 31.

In other words, throughout this litigation and during trial, Brocuglio argued that the arrest was unlawful because the defendants *lacked probable cause*, not because the arrest occurred in the back yard where the defendants were illegally present. Brocuglio contended the arrest lacked probable cause in his complaint, in his request to charge, and in the evidence he submitted. In his motion for a new trial, Brocuglio for the first time clearly and distinctly raises the argument that his arrest in the back yard would have been unlawful if premised upon his conduct in the front yard, because the defendants were unlawfully present in the back yard.

Brocuglio's new trial motion, argues, in effect, that the defendants' illegal presence in the back yard immunized him from arrest, either for prior illegal conduct and even for any illegal conduct in the presence of the officers. That theory fails. The illegal entry does not vitiate the existence of probable cause for events in the front yard, nor does it permit Brocuglio to undertake illegal conduct in the back yard at will and without fear of arrest.

Brocuglio's motion fails for three reasons – one procedural and two on the merits: (1) Brocuglio is presenting a new theory that he waived by not distinctly presenting it to me at trial or during the six years leading up to trial; (2) it is unclear whether *Payton v. New York*, 445 U.S. 573 (1980)*, governs the unlawful arrest claim, due to the unique facts of this case, and as such, defendants are entitled to qualified immunity on that claim because officers of reasonable competence could disagree about the lawfulness of an arrest where the defendants had probable cause to arrest, but were unlawfully present in the curtilage for reasons unconnected to the decision to arrest; and (3) the weight of evidence at trial demonstrates that the defendants in fact arrested Brocuglio in the back yard for the assault that occurred in the back yard, not based upon Brocuglio's conduct in the front yard, and therefore, even if defendants were unlawfully present

in the back yard, they lawfully arrested Brocuglio without a warrant, *see State v. Brocuglio*, 264

Conn. 778, 792 (2003). For these reasons, the jury's verdict was not a miscarriage of justice.

1. *Waiver*

Brocuglio waived the argument now made in his motion for a new trial because he did

not clearly and distinctly present that argument at trial or at any time during the six years leading

up to trial. Had Brocuglio advanced this theory earlier, I would have given counsel an

opportunity to put their views on the record, and I would have been able to carefully consider the

issue. Indeed, I would have encouraged both Brocuglio's counsel and defense counsel to brief

the issue. Instead, throughout the history of the case, Brocuglio advanced the theory that the

arrest was unlawful because the officers did not have probable cause to arrest Brocuglio, not

because they were unlawfully present in the curtilage.

In his operative complaint, Brocuglio asserted that the arrest was unlawful because the

officers conspired to trump up charges against him for which they knew they had no probable

cause. *See* Second Amended Complaint (doc. #84) ¶ 31. In January 2002, I granted Brocuglio's

motion for summary judgment against Proulx and O'Connor on the illegal search and seizure

claim with respect to the ticketing of the abandoned vehicles. At that time, Brocuglio did not

advance his current position – that is, that because Proulx and O'Connor were unlawfully present

in the back yard, any arrest in the back yard would have been *per se* unlawful unless Brocuglio

committed assault in the back yard. Indeed, I specifically asked Brocuglio's counsel about the

scope of his summary judgment motion, and counsel indicated that the motion was limited to the

Fourth Amendment violation as it related to the search and seizure of the abandoned vehicles.

*See* Jan. 30, 2002 Trans. (doc. #46) at 2. If Brocuglio intended to make the argument that the

same breach of the curtilage that resulted in an illegal search and seizure (with respect to the ticketing of the abandoned vehicles) also resulted in a *per se* unlawful arrest, it would have been prudent to make that argument at summary judgment.

In addition, I ordered the parties to file a joint pre-trial memorandum, delineating, among other things, their theories of the case, as well as disputed issues of fact and law. Brocuglio did not indicate that he intended to pursue a theory that the arrest was unlawful because the defendants were unlawfully present in the back yard, nor did he explain whether there was an issue regarding the lack of a warrant or the potentially disputed applicability of an exception to the warrant requirement. *See* doc. #100.

I also required the parties to submit proposed jury instructions with the joint pre-trial memorandum. *See* doc. #113, Attachment A (manually filed with no page numbers). Throughout his requested charge on the claim of unlawful arrest, Brocuglio repeatedly emphasized the concept of probable cause. He requested that I charge: "An arrest without a warrant is unconstitutional unless the arresting officer has 'probable cause' to believe that the plaintiff was committing or had committed a crime." *Id.* He also requested: "The question presented, which you must determine, is whether this arrest was made without probable cause, in violation of Brocuglio's constitutional right to be free of an unreasonable seizure." *Id.* Significantly, he requested: "If *probable cause existed* for the arrest, then the plaintiff was not deprived of his Fourth Amendment right not to be seized unreasonably." *Id.* (emphasis supplied). Conversely, he never distinctly requested a charge about the illegality of an arrest made in the back yard, nor did he suggest that a charge would be required about the need for an arrest warrant, or an exception to the warrant requirement.

During the trial, I gave Brocuglio an opportunity to file supplemental requested jury instructions. *See* doc. #136 (dated Oct. 11, 2005). In that submission, Brocuglio focused on his common law privilege to resist the defendants' unlawful entry onto his property by any means short of assault.[1] He did not, however, request an instruction that the arrest was *per se* unlawful because it was made in the back yard without an arrest warrant, nor did he request an instruction about the applicability of an exception to the warrant requirement. Indeed, it would have been inappropriate to charge the jury on the doctrine of exigent circumstances, or hot pursuit, as Brocuglio now seems to suggest, because there was no dispute at trial that the defendants did not pursue Brocuglio into the curtilage. The cases that Brocuglio cites in his Memorandum in Support of a New Trial are inapposite in light of the evidence introduced at trial. Moreoever, Brocuglio's current arguments are newly raised; at the time, Brocuglio requested the following: "The plaintiff claims that the arrest was unlawful *because it was made without probable cause* to believe that he committed a crime." *Id.* at 13 (emphasis supplied). Brocuglio referenced the fact that the defendants did not have an arrest warrant, but did not request a charge about the effect on the lawfulness of the arrest based upon the absence of a warrant.

I also held two lengthy charge conferences before finalizing the instructions to the jury – on October 13, 2005 and October 17, 2005. At the October 13th conference, Brocuglio's counsel

---

[1] Unlike the argument Brocuglio now makes in his motion for a new trial, Brocuglio clearly raised the issue of privilege during trial. I agreed with Brocuglio on this point, and therefore instructed the jury that it could not find that the defendants had probable cause to arrest Brocuglio based upon his conduct in the back yard, unless the conduct in the back yard rose to the level of assault. *See* Jury Instructions (doc. #142) at 9. That was the charge that Brocuglio requested, and I agreed that it was a correct statement of the law. Because Brocuglio clearly raised the privilege issue, I was able to thoroughly discuss it with counsel and make the appropriate changes to the charge.

did not argue that the arrest was *per se* unlawful because the officers were unlawfully present in the back yard for the purpose of ticketing abandoned vehicles, nor did he request an instruction about the absence of a warrant or the applicability of an instruction on exigent circumstances. At the October 17th conference, the evening before I was to charge the jury, Brocuglio's counsel indicated that he objected to the jury instructions, but did not explain the theory that he is now advancing in his motion for a new trial. Rather, the focus at the October 17th charge conference was on the scope of Brocuglio's privilege to resist the defendants' entrance onto his property. Brocuglio's counsel failed to raise the issue on which he now bases his motion for a new trial. Brocuglio's counsel vaguely argued that, because the defendants did not arrest Brocuglio in the front yard, they could not later arrest him for that conduct. In other words, Brocuglio's counsel asserted that the officers had, in effect, waived the right to arrest Brocuglio for his conduct in the front yard because they had not arrested him immediately when the conduct occurred in the front yard. That argument is wrong as a matter of law, and is not the same proposition that Brocuglio now advances. In short, at neither charge conference did Brocuglio's counsel clearly and distinctly express the theory that he is now pursuing.

On the last day of trial, just before I charged the jury, Brocuglio's counsel briefly voiced the issue that he now raises in the motion for a new trial. He argued, in effect, that the officers could not go into Brocuglio's back yard *for the purpose of* arresting Brocuglio for his actions in the front yard. I was not inclined to give that charge because it was not supported by the evidence; even Brocuglio never asserted that the officers pursued him into the back yard for the purpose of arresting him. Counsel did, however, go on briefly and vaguely to suggest that the

arrest was unlawful because the officers were unlawfully present in the back yard.[2]

In sum, Brocuglio is now presenting a theory that he did not distinctly present to me during trial, or during the six years preceding trial. Brocuglio's theory had always been that there was no probable cause for the arrest – a subject on which I fully charged the jury – not that the arrest was unconstitutional under *Payton v. New York*, 445 U.S. 573 (1980), and subsequent decisions. He has, therefore, waived the issue. *See Rizzo v. Edison, Inc.*, 172 Fed. Appx. 391, 393 (2d Cir. 2006) (non-precedential summary order); *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 803 (2d Cir. 1992). Brocuglio never "object[ed] to the arrest on the ground that the police lacked an arrest warrant. General statements in Plaintiff's complaint – that the arrest was 'false,' 'unlawful,' and without consent – did not put defendants or the district court on notice that Plaintiff was contesting anything other than the lack of probable cause." *Rizzo*, 172 Fed. Appx.

---

[2] At the October 17th charge conference, Brocuglio's counsel had argued at length about the scope of Brocuglio's common law privilege to resist the officers' unlawful entry into his back yard. In addition, he argued at length that, because the officers declined to arrest Brocuglio in the front yard for the conduct that occurred there, they effectively waived the right to arrest him for conduct in the front yard. Thus, when Brocuglio's counsel raised an objection on the morning that I charged the jury, and began by saying he had already raised the point a number of ways, I understood him to be repeating those same arguments. Brocuglio's counsel did not raise the present argument when I asked him at the charge conference what was wrong with the charge he now complains about.

In hindsight, it appears that Brocuglio's counsel may have been attempting to raise a new issue – that is, that any arrest in the back yard would have been unlawful because defendants were unlawfully present there. At the time, however, I did not understand Brocuglio's counsel to be making that claim. That explains why I told him that he had already repeatedly preserved his argument. I understood him to be referring to his arguments regarding privilege and whether defendants waived the right to arrest Brocuglio in the front yard by not arresting him right away in the front yard, not that the arrest was a violation of the Fourth Amendment because defendants were unlawfully present in the back yard. Brocuglio's counsel did not clarify that he was making a new point, not the same point that he had raised the previous evening at the charge conference. Thus, in my view, Brocuglio did not clearly and distinctly raise the issue he now relies upon.

at 393. More importantly, Brocuglio suffered no miscarriage of justice in any event, as discussed below in section three.

### 2. *Officers Did Not Enter Curtilage for the Purpose of Arresting Brocuglio*

In addition, and in the alternative, even if Brocuglio had pressed the argument he is now making during trial, I am not sure whether I would have given the charge that he now asserts I should have given. The law is unclear whether Brocuglio's arrest in the back yard was lawful, because of the unusual fact in this case that the Fourth Amendment violation of the curtilage was unrelated to the decision to arrest. I would have likely granted qualified immunity to the defendants because the law was not clearly established in September 1996 whether the officers could arrest Brocuglio in the curtilage after they entered the curtilage unlawfully for another purpose, i.e., to search for abandoned vehicles.

Brocuglio now argues, in effect, that *any* arrest in the back yard would be illegal because the defendants entered the back yard in violation of the Fourth Amendment.[3] That proposition

---

[3] In his memorandum in support of a new trial, Brocuglio cites, for the first time, numerous cases involving Fourth Amendment principles. It is axiomatic that the Fourth Amendment prohibits unreasonable searches and seizures. *See generally* 3 LaFave § 5.1. The United States Supreme Court has interpreted and clearly defined the concept of reasonableness as it applies to an arrest in an individual's home. *See Payton*, 445 U.S. at 586 ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."). "'[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* at 589-90 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590. It has long been established that curtilage receives the same protections under the Fourth Amendment as the home itself. *See generally* 1 LaFave § 2.3(f) at 598 ("Certain lands adjacent to a dwelling called the 'curtilage' have always been viewed as falling within the coverage of the Fourth Amendment."). *See also Oliver v. United States*, 466 U.S. 170, 180 (1984) (noting that "the curtilage . . . warrants the Fourth Amendment protections that attach to the home").

cannot be correct.  The officers' Fourth Amendment violation does not grant Brocuglio immunity from arrest.  As the Connecticut Supreme Court has held, if an individual commits a new crime in the presence of the officers while the officers are unlawfully present in a constitutionally protected area (i.e., the curtilage), the officers are permitted to arrest the individual.  *See Brocuglio*, 264 Conn. at 778.  Thus, no absolute rule bars any arrest in the curtilage just because the defendants violated the Fourth Amendment when they entered the curtilage.  Rather, the case law, including *Payton* and subsequent decisions, counsels that it is unlawful to effect an arrest in the home or the curtilage after violating the Fourth Amendment for *the purpose of* making an arrest.  That did not happen in this case because there was a disconnect between the officers' entrance into the curtilage and the later arrest.

It is undisputed that the officers did not enter the curtilage for the purpose of arresting Brocuglio; rather, they entered for the purpose of ticketing abandoned vehicles, and have already been held liable for that unconstitutional search and seizure with respect to the vehicles.  In other words, the Fourth Amendment violation here involved the failure to obtain a *search* warrant, not the failure to obtain an *arrest* warrant.  Although the cases Brocuglio cites speak in general terms about the presumptive invalidity of an arrest in the home or curtilage made without an arrest warrant, those cases do not address the specific factual scenario presented here.

Brocuglio now argues, in essence, that because Proulx and O'Connor entered the

_____

Those principles are fundamental, and I do not dispute them.  The problem here is that Brocuglio never distinctly suggested their applicability to this case prior to filing his motion for a new trial.  In addition, much of the case law he cites is inapposite, because this was not a case about hot pursuit or exigent circumstances.  Furthermore, the cases Brocuglio cites are not directly on point because in this case, the defendants did not enter the curtilage for the purpose of arresting Brocuglio.

curtilage without a search warrant, they cannot arrest Brocuglio there for crimes committed *in their presence* without first obtaining an arrest warrant.  That argument fails because the right to be free from an unlawful arrest is distinct from the right to be free from an unlawful search.  3 LaFave § 6.1(b) (discussing the distinct rights affording protection for arrests and searches). The main purpose of the Fourth Amendment is to guard against the "physical entry" into the home, or in this case, the curtilage.  *See Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984).  Here, that concern has been adequately safeguarded by my decision regarding the illegal entry for purposes of ticketing the abandoned vehicles.

Therefore, had Brocuglio pressed his current argument, I am not sure I would have given the instruction he now claims I should have given.  It is unclear how the cases Brocuglio now cites apply to the unique facts of this case, and Brocuglio does not cite any case for the exact proposition at issue here.

Even if I had determined that the defendants violated the Fourth Amendment by arresting Brocuglio in the curtilage without an arrest warrant, based upon his conduct in the front yard, I would have held that the defendants were nevertheless entitled to qualified immunity.  Although it was clearly established law in 1996 that an officer could not enter the curtilage without a warrant in order to arrest an individual, reasonable officers could disagree whether that principle applied to the unique factual situation in this case – that is, where the defendants entered the curtilage for a purpose unrelated to the arrest, but while in the curtilage decided to arrest Brocuglio.

The doctrine of qualified immunity shields governmental officials from liability for conduct taken within the scope of their official duties, as long as "'their conduct does not violate

a clearly established constitutional right of which a reasonable person would have known.'" *Huminski v. Corsones*, 386 F.3d 116, 143 (2d Cir. 2004) (quoting *Shecter v. Comptroller of the City of New York*, 79 F.3d 265, 268 (2d Cir. 1996)).  Qualified immunity involves a three-step analysis: (1) whether the officials violated the plaintiff's constitutional right; (2) whether the law was clearly established with respect to that right; and (3) whether reasonable officers could disagree about whether their conduct was illegal.  *See id.*  "Clearly established means that (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."  *Pabon v. Wright*,  459 F.3d 241, 255 (2d Cir. 2006) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)).  Even if a right is clearly established, a defendant may still establish immunity by "'showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition.'"  *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996)).

Determining whether or not a right is clearly established at any given time depends, in large part, on how that right is defined.  On that subject, the Second Circuit has noted:

> The chronic difficulty with this analysis for courts is in accurately defining the right at issue. An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly established.  On the other hand, as the Supreme Court noted in *Anderson*, if the right is defined too broadly, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*LaBounty*, 137 F.3d at 73-74 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  It is not necessary for the very action in question to have previously been held unlawful in order to

bar the application of qualified immunity. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). The question is whether, based on existing law, the unlawfulness of the action was apparent. *Id.*

Here, the right at issue is Brocuglio's right to be free from any arrest in his back yard, although the defendants had probable cause to arrest him and breached the curtilage for a purpose unrelated to the decision to arrest. The Second Circuit has held that when "'the factual record is not in serious dispute . . . [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.'" *See, e.g., Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.), *cert. denied*, 498 U.S. 967 (1990)). Applying the objective reasonableness test to the essentially undisputed facts at trial, "officers of reasonable competence" could disagree about whether they could arrest Brocuglio in the back yard based upon probable cause for conduct occurring in the front yard, where they were unlawfully present in the curtilage but did not enter the curtilage for the purpose of arresting Brocuglio. *See Lennon*, 66 F.3d at 420-21. Thus, to the extent that the jury found that Brocuglio's arrest was lawful because defendants had probable cause to arrest based upon conduct in the front yard, the jury's verdict was not a miscarriage of justice.

> 3. *The Weight of the Evidence at Trial Supports a Finding that the Officers Arrested Brocuglio for Assault Committed in the Back Yard*

Even if I were to apply the theory that Brocuglio now advances, Brocuglio suffered no harm from the jury's verdict, and there is no miscarriage of justice. That is because the weight of the evidence at trial supports a finding that the officers, in fact, arrested Brocuglio for assaulting them in the back yard, not based upon Brocuglio's actions in the front yard, even though

Brocuglio was ultimately charged with offenses resulting from conduct in both the front yard and back yard. Although the defendants were unlawfully present in the back yard, they could lawfully arrest Brocuglio in the back yard if Brocuglio's actions rose to the level of assault. *See Brocuglio*, 264 Conn. at 792. The weight of the evidence at trial demonstrates that the officers had probable cause to arrest Brocuglio for assault in the back yard.[4]

After the altercation in the front yard, Proulx and O'Connor proceeded to the back yard. It is undisputed that their purpose in entering the back yard was not to arrest Brocuglio, but rather to ticket the allegedly abandoned vehicles within the curtilage. I have already ruled in Brocuglio's favor, finding that the defendants' entering the curtilage to search for abandoned vehicles without a warrant constituted an unreasonable search and seizure. *See* Ruling on Defendants' Motion for Reconsideration (March 23, 2007). While the officers were ticketing the vehicles in the curtilage, Brocuglio left his house. Proulx and O'Connor then had another altercation with Brocuglio, during which Brocuglio assaulted the officers. Based on the trial evidence, it was this second altercation that prompted the defendants to arrest Brocuglio.

Even if the defendants were unlawfully present in the back yard, if Brocuglio assaulted them, the defendants could lawfully arrest him. *See Brocuglio*, 264 Conn. at 792. There is an additional wrinkle in this case, because based on the state of the law in September 1996, Brocuglio had a limited common law right to resist the officers' entry into his curtilage. *State v. Gallagher*, 191 Conn. 433 (1983). That is why I instructed the jury at Brocuglio's request:

---

[4] Brocuglio was not found guilty in his criminal case on the charge of assault with respect to his conduct in the back yard. That does not affect my conclusion. A criminal finding of guilt requires proof beyond a reasonable doubt, whereas the issue in this case is whether the officers had probable cause to arrest Brocuglio for assault in the back yard.

"Brocuglio's actions in the rear of the house could not give rise to probable cause to arrest him for a charge other than assault because he had a right to resist the officers' unlawful entry into his back yard/kitchen by actions that did not amount to assault." Jury Instructions (doc. # 142) at 9. That charge is an accurate statement of the law as it existed in September 1996. *See Gallagher*, 191 Conn. at 433. The charge appropriately instructed the jury that it could only find that there was probable cause to arrest Brocuglio based on his actions in the back yard if the actions in the back yard amounted to assault, because if his actions amounted to something less than assault, under *Gallagher*, he was permitted to engage in that limited resistance. I also instructed the jury on the elements of assault of a police officer. Jury Instructions (doc. # 142) at 9.

In sum, I properly instructed the jury that the defendants could not arrest Brocuglio for his conduct in the back yard unless it amounted to assault. The evidence at trial supports a finding that Brocuglio's conduct rose to the level of assault, and it was that assault that prompted Proulx and O'Connor to arrest him. Proulx and O'Connor were at Brocuglio's residence principally to ticket the allegedly abandoned vehicles, and that was their purpose in entering the curtilage. There is no indication that they intended to arrest Brocuglio based upon his conduct in the front yard. It was only after they were already in the back yard ticketing vehicles that they arrested him, following conduct by Brocuglio rising to the level of assault.

4.     *Summary of Jury Instructions Issues*

In conclusion, Brocuglio's motion fails for each of the following reasons: (1) Brocuglio waived the argument that the arrest was *per se* unlawful under *Payton*, because he clearly and distinctly raised the argument for the first time in his motion for a new trial, rather than prior to the jury charge; (2) it is unclear whether *Payton* applies to the unique facts of this case, and as

-18-

such, defendants are entitled to qualified immunity on the unlawful arrest claim; and (3) the trial evidence makes clear that the defendants arrested Brocuglio based on probable cause to believe he committed assault in the back yard, not for his conduct in the front yard. In making a motion for a new trial, Brocuglio has the difficult burden of showing that "the verdict is a miscarriage of justice." He has not done so, and therefore, all five of his arguments with respect to the jury instructions fail.[5]

    B.    <u>Judgment as a Matter of Law in Favor of Larson, Decrescenzo, Shay, and the Town</u>

On October 12 and 13, 2005, I granted the defendants' motion for judgment as a matter of law with respect to defendants Timothy Larson (deputy mayor), Robert Decrescenzo (mayor), James Shay (police chief), and the Town. Brocuglio complains that my decision was erroneous and that I should grant his motion for a new trial on this ground. I decline to do so, because my decision correctly applied controlling law and was not a miscarriage of justice.

Brocuglio brought claims pursuant to 42 U.S.C. § 1983, alleging unreasonable search and seizure, unlawful arrest, and malicious prosecution against Larson and Decrescenzo in their individual capacities. *See* Second Amended Complaint (doc. #84) at ¶¶ 36-41 (Count 1). He

---

[5] With respect to the excessive force claim, I instructed the jury, as Brocuglio requested, that if the arrest was unlawful, any amount of force used to effect the arrest was excessive, unless Brocuglio assaulted the officers. Jury Instructions (doc. #142) at 18. Brocuglio now argues that I should have instructed the jury that, "because defendants Proulx and O'Bonnor were not lawfully present in the rear yard of his home, his arrest was unlawful and any degree of force used to effecting [sic] his arrest was excessive." Memorandum in Support of New Trial at 18. Because I find that the arrest was lawful, my instruction regarding excessive force was correct.

I do not repeat each of Brocuglio's five arguments here. *See supra*, at 3. I have considered each argument, however, and have determined that none of the arguments has any merit in light of my findings.

brought a substantive due process claim pursuant to section 1983 against Larson in his individual capacity. *See* Second Amended Complaint at ¶¶ 45-46 (Count 3). He brought a claim against the Town based on the Connecticut dog bite statute, Conn. Gen. Stat. § 22-357. *See* Second Amended Complaint at ¶¶ 50-52 (Count 5). Finally, Brocuglio brought a municipal liability claim, based on the alleged unreasonable search and seizure, unlawful arrest, and excessive use of force, against Shay, Decrescenzo, and Larson in their official capacities. *See* Second Amended Complaint at ¶¶ 53-58 (Count 6). An official capacity suit is simply another way of pleading a claim against a municipality. *Monell v. Dep't. of Social Services of the City of New York*, 436 U.S. 658, 690, n.55 (1978). It is treated in all respects as a suit against the municipality. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Thus, the official capacity claims are, in effect, claims for municipal liability against the Town.

1.  *Section 1983 Legal Standard*

To prevail on a section 1983 claim, a plaintiff must prove four elements: (1) actions taken under color of law; (2) deprivation of constitutional or statutory right; (3) causation; and (4) damages. *See* 42 U.S.C. § 1983. There are additional requirements depending on whether the claim is against an official in his individual or official capacity. With respect to claims against persons in their individual capacities, a plaintiff must show "that the defendant was personally involved - that is, he directly participated - in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). "Direct participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Id.* With respect to claims against persons in their official capacities, when a plaintiff

brings a section 1983 claim against a municipality, he must prove a fifth element – that an official policy of the municipality caused his constitutional injury. *See Monell*, 436 U.S. at 690-91.

The *Monell* Court limited municipal liability under section 1983 by concluding that a municipality may not be found liable based on the vicarious liability theory of respondeat superior. *Monell*, 436 U.S. at 691. Instead, a municipality may only be sued directly if a plaintiff alleges that a "municipal policy of some nature caused a constitutional tort." *Id.* In other words, a municipality may not be found liable simply because one of its employees or agents committed a tort. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 405 (1997).

After evaluating the legislative history of section 1983, the United States Supreme Court has concluded that vicarious liability would be inconsistent with section 1983's causation requirement. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988). As a result, "the 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). *See also Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003) (explaining that plaintiff must show that municipality is actually responsible for her injury). The Supreme Court has emphasized that:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action and the
deprivation of federal rights.

*Brown*, 520 U.S. at 404.

The decisions interpreting *Monell* have discussed several ways in which a plaintiff may

establish an official municipal policy. Relevant to this case, "municipal liability may be imposed

for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*,

475 U.S. at 480. When a plaintiff's theory of municipal liability is based on showing that a

single action by a municipal employee caused the constitutional injury, rather than showing that a

formally adopted or ratified municipal policy caused the injury, a plaintiff must demonstrate that

the official had final policymaking authority for the particular subject matter involved.

*Praprotnik*, 485 U.S. at 123-25; *Jett v. Dallas Independent School District*, 491 U.S. 701, 737

(1989); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Also relevant to this case, "The

existence of an official municipal policy or custom can also be demonstrated by establishing a

deliberate government policy of failing to train or supervise its officers." *Anthony v. City of New

York*, 339 F.3d 129, 140 (2d Cir. 2003) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378,

388-89 (1989)). In order for municipal liability to attach under a failure-to-train theory, the

failure to train must amount to "deliberate indifference to the rights of persons with whom the

police come into contact." *Id.*

> 2.   *Individual Capacity Claims (Counts 1 and 3 Against Larson and
>      Decrescenzo)*

It is not clear whether Brocuglio seeks a new trial on the individual capacity claims. To

the extent that he does, there was almost no evidence presented at trial implicating Larson and

Decrescenzo in their individual capacities. There was some evidence that Larson told Proulx and

O'Connor that they should take "the dog" with them when they went to ticket vehicles outside of Brocuglio's home. There was also some evidence from which one could infer that Decrescenzo initially ordered the ticketing of abandoned vehicles that violated Town Ordinance 21-1. There was not, however, evidence that either Decrescenzo or Larson "directly participated in the alleged constitutional violations." *See Gronowski*, 424 F.3d at 293. There was no evidence that Decrescenzo and Larson intentionally violated Brocuglio's constitutional rights. *See id.* Thus, it was appropriate to grant judgment as a matter of law in favor of Decrescenzo and Larson in their individual capacities.

3.    *Official Capacity Claims, i.e., Municipal Liability Claims (Count 5)*

Brocuglio argues that he presented sufficient evidence at trial for the claims to have gone to the jury based on two theories of municipal liability: (1) a policy or practice of failure to train, and (2) actions or decisions of individual final policymaking officials that instigated the constitutional violations on September 27, 1996. Brocuglio claims that those two theories apply to his alleged constitutional violations relating to excessive force/use of a police canine, unlawful arrest, and unreasonable search and seizure through enforcement of Town Ordinance 21-1.

a.    Failure to Train

i.    Excessive Force/Use of Police Canine

Brocuglio argues that he submitted sufficient evidence to support claims against the Town based upon a failure to properly train its police officers in the use of police canines. He reasons that, "Such a failure to train, if credited by the jury, was a policy of the Town that resulted in the constitutional violations that occurred in this case." *See* Plaintiff's Memorandum in Support of Motion for New Trial at 21. That specific argument only pertains to Brocuglio's

excessive force and dog bite claims. The problem with that argument is that the jury decided as a factual matter that Brocuglio's constitutional rights with respect to excessive force and the use of the police dog were not violated. When there is no underlying constitutional violation, there can be no municipal liability. *Los Angeles v. Heller*, 475 U.S. 796 (1986). The jury found in favor of defendants on the excessive force claim. Because the jury found that Brocuglio's constitutional rights were not, in fact, violated, the jury could not have found that a policy or practice of the Town caused a constitutional violation.[6] Therefore, even if there was sufficient evidence concerning the Town's failure to train with respect to the police dog/use of force to reach the jury, the verdict is not a miscarriage of justice.

Moreover, even if the jury had found an underlying constitutional violation, the municipal liability claim would still fail as a matter of law. Although Brocuglio submitted evidence through his expert that Proulx and O'Connor did not apply the appropriate "use of force," there was not sufficient evidence from which a jury could conclude that the inappropriate use of force was linked to a deliberate Town policy of failure to train.

ii.    Unlawful Search and Seizure/Enforcement of Town
          Ordinance 21-1

Brocuglio also argues that the officers' actions in enforcing Town Ordinance 21-1 by ticketing abandoned vehicles in Brocuglio's back yard, implicated municipal liability in two ways. First, he claims that the officers were improperly trained in how to enforce Ordinance 21-

---

[6] For example, Brocuglio cites the testimony of his police practices expert, Reginald Allard, claiming that Allard testified that the Town's training policy on the use of force was deficient. Plaintiff's Memorandum in Support of Motion for a New Trial at 20-21. Even if true, that testimony is now irrelevant, because the jury found that there was no constitutional violation.

1. Second, he claims that officials with final policymaking authority, Decrescenzo and Larson, made personal decisions with respect to enforcing Ordinance 21-1 that implicate municipal liability.

In his memorandum in support of his motion for a new trial, Brocuglio claims that his police practices expert, Reginald Allard, testified about what training the officers in this case should have received with respect to Ordinance 21-1. That argument misses the point. The Town is not required to train its police officers on how to enforce every ordinance in every conceivable factual setting. Rather, the Town is required to train its officers on the reach and application of the Fourth Amendment. There was evidence at trial that the officers received training on the Fourth Amendment. Brocuglio cross-examined Officers Proulx and O'Connor about whether they understood the Fourth Amendment and its relationship to Ordinance 21-1. Even if the officers failed to learn or remember the lesson, however, does not demonstrate that the officers were inadequately trained; the Town made reasonable efforts to train. Therefore, Brocuglio failed to meet the "deliberate indifference requirement" of a failure-to-train theory of municipal liability. *See Anthony*, 339 F.3d at 140 (citing *Harris*, 489 U.S. at 388-89).

b.    Actions of Individuals with Final Policymaking Authority

Brocuglio also claims that there was evidence at trial that Larson and Decrescenzo "personally instigated and directed actions that resulted in constitutional violations." *See* Plaintiff's Memorandum in Support of Motion for New Trial at 21. Because they were final policymakers for the Town, Brocuglio argues, their individual decisions established a policy, thereby subjecting the Town to liability. *See Pembaur*, 475 U.S. at 480.

Although Brocuglio's theory is legally viable, there was almost no evidence at trial to

support it.  Assuming for present purposes that Larson is a final policymaker,[7] there was no

evidence at trial that Decrescenzo, Larson, or Shay ordered the police officers to commit

constitutional violations.  Brocuglio argues that, because Decrescenzo and/or Larson "instigated

the tagging actions," they necessarily committed or knowingly directed constitutional violations.

To the contrary, that Decrescenzo and/or Larson initially ordered the officers to tag unregistered

vehicles does not mean that they directed a constitutional violation, specifically, an unreasonable

search and seizure.  There was no evidence at trial that anyone told the officers to enter the back

yard to tag vehicles without a warrant, or to disregard the Fourth Amendment in order to carry

out the tagging activities.  Tagging abandoned vehicles is not a constitutional violation, unless, as

the officers did here, they enter an area protected by the Fourth Amendment without a warrant or

exception to the warrant requirement in order to do so.

Municipal liability cannot be based on a theory of respondeat superior.  Brocuglio did not

prove that the municipality was the "moving force" behind the officers' unreasonable search and

seizure, because there was no evidence linking a final policymaker to the officers'

unconstitutional conduct.  Brocuglio is attempting to make the Town liable for the constitutional

torts of its employees, Proulx and O'Connor, with respect to the unlawful search and seizure that

they committed when enforcing the town ordinance, even though there was no evidence that a

final policymaker committed a constitutional violation.  The decisions interpreting *Monell*

expressly prohibit just such an outcome.  *See, e.g*, *Brown*, 520 U.S. at 405.

Thus, both theories of municipal liability, failure to train and single decision by final

---

[7] It is not clear whether Larson, the deputy mayor or assistant to the mayor, was a final policymaker.  As a deputy or assistant, his decisions were necessarily subject to review or approval by his supervisor.

policymaker, fail because there was not sufficient evidence at trial to support either theory. In addition, with the exception of the unreasonable search and seizure claim, which I determined as a matter of law at summary judgment, the jury did not find any underlying constitutional violations. The Town could therefore not be liable for any claim except the unreasonable search and seizure claim, and for the reasons discussed above, there was no evidence sufficient to establish the existence of a municipal policy.

C.  Prejudice to Brocuglio by Allowing Defendants to Present Evidence Concerning Facts Affecting Qualified Immunity

On January 30, 2002, well before the start of trial, I granted summary judgment in Brocuglio's favor on his unreasonable search and seizure claim against Proulx and O'Connor. During trial, on Wednesday, October 12, 2005, outside the presence of the jury, the defendants made what was essentially a motion for reconsideration of my summary judgment ruling concerning (1) whether the area in the rear of Brocuglio's home was protected curtilage, and (2) whether qualified immunity applied to bar liability. *See* October 12, 2005 Transcript (doc. # 159) ("Oct. 12, 2005 Trans.") at 145. I indicated that defense counsel should only address the question of qualified immunity and the factual issues surrounding that question. *Id.* at 147. At that time, Brocuglio's counsel argued that I should not reconsider my prior ruling at all. I responded that it did not make sense to wait until there was a final judgment and appeal to determine if I had made a mistake. *Id.* at 150. Brocuglio's counsel acknowledged that such a proposition did not make sense. Rather, the appropriate action for me to take if a party alerts me that I may have entered a judgment in error is to discuss the issue with the parties – not to wait until the case is appealed. *Id.* at 151.

Brocuglio's counsel objected to me taking additional evidence at trial and then using that evidence as a basis to change my summary judgment ruling. *Id.* at 153. In his memorandum in support of his motion for a new trial, Brocuglio argues that the law-of-the-case doctrine prohibited me from reviving the factual issues surrounding the question of qualified immunity. "The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Arizona v. California*, 460 U.S. 605, 618 (1983). In the Second Circuit, "the law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission." *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing *First Nat'l Bank of Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 453 n.3 (2d Cir. 1976)).

The law-of-the-case doctrine is not meant to prevent a judge from correcting a potential mistake in a decision made prior to a final judgment. Here, defendants raised the possibility of such a mistake. Without ruling on defendants' motion for reconsideration one way or the other, I allowed counsel to introduce very limited evidence relevant to the factual issues surrounding my previous ruling denying qualified immunity with respect to Brocuglio's Fourth Amendment search and seizure claim, so that the jury could answer four special interrogatories. In the event that either I or the Court of Appeals decided to review my prior ruling, those factual findings would be relevant, and it would not be efficient to hold an entirely new trial to address those limited issues.[8]

---

[8] In February 2002, defendants appealed my summary judgment ruling, holding that Proulx and O'Connor violated Brocuglio's right to be free from unreasonable searches and seizures and that they were not entitled to qualified immunity. *See Brocuglio v. Proulx*, 67 Fed. Appx. 58 (2d Cir. 2003) (non-precedential summary order) (dismissing the appeal to the extent it raised factual arguments, but commenting on defendants' arguments to the extent they raised

At trial, I explained that my decision to take additional evidence on the factual issues surrounding qualified immunity was intended to ensure that the Court of Appeals would have a complete record when the case was appealed. Oct. 12, 2005 Trans. at 153-54. I did not decide the issue whether I would actually consider the evidence taken at trial. Rather, I decided to allow the evidence to be presented, so that "the Court of Appeals [would have] everything the [C]ourt [of] [A]ppeals needs to decide the issue without a retrial." *Id.* at 156. I recognized that the Court of Appeals:

> may say, they may completely agree with you: You know what? The judge decided it, that's the end of the story. The evidence never should have come in . . . Or they could say no, we agree with the defendants the evidence should have come in . . . The advantage [of hearing the evidence] is we don't have to try the case again.

*Id.* at 156.

Brocuglio, citing *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 386-87 (2d Cir. 1989), argues that my decision to permit evidence regarding factual issues affecting qualified immunity caused Brocuglio substantial prejudice. In *Leddy*, however, the Court of Appeals held that if the judge broadens the scope of trial, "he must inform the parties and give them an opportunity to present evidence relating to the newly revived issue." *Id.* If the trial judge fails to heed that instruction, it could cause substantial prejudice. *Id.*

In this case, I heeded that instruction by taking several steps. First, I notified counsel that I intended to permit limited questioning on the factual issues surrounding qualified immunity, and I emphasized to counsel that those factual issues were extremely limited issues. *See, e.g.*, Oct. 12, 2005 Trans. (doc. # 159) at 154, 157, 162. I allowed Brocuglio to conduct a rebuttal

factual issues).

case.  In addition, I told Brocuglio that "he could present all the evidence" he wanted with respect to the factual issues surrounding qualified immunity.  *Id.* at 157.  I gave Brocuglio five days, including a weekend, to prepare the evidence he wanted to present.  *Id.* at 159.  Specifically, I allowed him to:

> Call as many witnesses as you want.  Call a fence expert, call the installer, anybody you want to call.  Recall the next door neighbor that he called who testified about fences.  Call anybody you want.  The point is I think we ought to have special interrogatories to the jury on the factual questions that would permit the Court of Appeals and/or me, if I choose to do it, to consider the qualified immunity issue.

*Id.* at 159.  Finally, I did not charge the jury regarding the special interrogatories or give them the special interrogatories until after the jury returned their verdict.  The jury did not even consider the four factual issues surrounding the qualified immunity question until after they had returned their verdict on Brocuglio's substantive claims.  Because I took all of those precautions, Brocuglio did not suffer substantial prejudice.  In *Leddy*, the Court of Appeals determined that there was no substantial prejudice, because the allegedly prejudiced party conceded that there was no additional evidence it would have presented.  *See Leddy*, 875 F.2d at 386-87.  Similarly, in this case, there was no prejudice, because I gave Brocuglio an opportunity to present all the evidence he wanted to present regarding the revived issue.

In sum, I did not make a decision changing "the law of the case."  I merely allowed the introduction of evidence concerning very limited factual issues, in order to preserve the record for appeal or for a motion for reconsideration.  The decision to take limited additional evidence for the sake of judicial efficiency did not prejudice Brocuglio because of the substantial protective measures I employed.

D.      Evidentiary Rulings[9]

        1.      *Cross-Examination About Brocuglio's Civil Commitment*

Brocuglio argues that I should have prohibited defense counsel from cross-examining

Brocuglio about his civil commitment at the Cedar Crest mental health facility.  Brocuglio claims

that, pursuant to Rule 403 of the Federal Rules of Evidence, the probative value of such evidence

was substantially outweighed by the danger of unfair prejudice.

        The Second Circuit has held that "under Rule 403, so long as the district court has

conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its

conclusion will be disturbed only if it is arbitrary or irrational."  *United States v. Awadallah*, 436

F.3d 125, 131 (2d Cir. 2006); *United States v. Han*, 230 F.3d 560, 564 (2d Cir. 2000); *Hester v.

BIC Corp.*, 225 F.3d 178, 181 (2d Cir. 2000) ("A district court's evidentiary rulings will be

disturbed only if they are manifestly erroneous. ") (internal quotation omitted).

        In his memorandum in support of his motion for a new trial, Brocuglio complains that the

evidence of his civil commitment was brought out by defense counsel cross-examining him.  A

review of the transcript of Brocuglio's testimony, however, indicates otherwise.  There is no

mention of Brocuglio's civil commitment during his cross-examination.  *See* Oct. 4-5, 2005

Trans. (docs. # 127 and 137).

        Rather, the evidence of Brocuglio's commitment at Cedar Crest occurred during the

cross-examination of Dr. Cardamone, who had testified on direct examination about his medical

---

[9] Generally, Brocuglio has not cited the trial record with respect to his arguments
regarding evidentiary rulings.  Although I have attempted to address any potential argument
Brocuglio could make, it is not entirely clear what particular evidentiary rulings Brocuglio
challenges.

and psychiatric evaluation of Brocuglio. Defense counsel questioned Dr. Cardamone about Brocuglio's stay at Cedar Crest, in order to probe Dr. Cardamone's conclusion regarding Brocuglio's psychological condition. In addition, defense counsel questioned Ruth Brocuglio about Brocuglio's commitment at Cedar Crest, but only after Ruth Brocuglio testified that, prior to the September 1996 incident, Brocuglio had no mental issues and was acting normally. In order to test the veracity of that factual assertion, defense counsel questioned whether Ruth Brocuglio knew about the civil commitment. Ruth Brocuglio testified that, prior to September 27, 1996, Brocuglio was acting normally and that she had no concern about his mental well-being. Prior to the start of trial I had ruled that defense counsel could not bring up the issue of Brocuglio's commitment at Cedar Crest unless the door was opened. Dr. Cardamone and Ruth Brocuglio did just that, both when he testified about his evaluation of Brocuglio and when she testified regarding Brocuglio's mental state prior to September 1996.

I determined that defense counsel was entitled to probe Ruth Brocuglio's credibility on that issue. Because Brocuglio sought damages due in part to the psychological ramifications of the September 1996 incident, I determined that defense counsel should be able to inquire whether there were pre-existing mental conditions. Thus, the probative value was three-fold: (1) Brocuglio's prior commitment was probative of whether Brocuglio's claimed psychological damages were affected by pre-existing conditions; (2) whether Ruth Brocuglio knew that her son had been committed at Cedar Crest was probative of her credibility regarding her testimony that, prior to September 27, 1996, Brocuglio had no mental issues, and (3) similarly, Ruth Brocuglio's knowledge of the civil commitment was probative of whether Brocuglio had any pre-existing mental conditions prior to September 27, 1996. I did not permit defense counsel to introduce the

actual order of civil commitment.

Prior to the examination and outside the presence of the jury, I heard argument from Brocuglio's counsel and defense counsel on the issue whether defense counsel should be permitted to question Ruth Brocuglio about Brocuglio's civil commitment. In response to counsel's concern about the danger of unfair prejudice, I concluded that the cross-examination was necessary, in order to permit defense counsel to attack the witness's credibility and to impeach the factual assertion that Brocuglio suffered no mental ailments prior to September 26, 1997. Although I considered the danger of unfair prejudice, the probative value of the limited cross-examination to address those issues substantially outweighed that potential danger. That was especially true, because the jury had already heard from Dr. Cardamone that Brocuglio had been civilly committed.

In sum, I conscientiously balanced the danger of unfair prejudice against the probative value of the cross-examination regarding Brocuglio's civil commitment. Ultimately, limited cross-examination on that topic was necessary, because witnesses for the plaintiff opened the door. The introduction of that evidence did not render the jury's verdict a miscarriage of justice.

2.    *Cross-Examination Regarding Past Crimes*

Brocuglio argues that I should have excluded evidence of Brocuglio's past arrests pursuant to Rule 404(b), because the purpose of the evidence was to show that Brocuglio had a tendency to violate the law. In addition, Brocuglio complains that I should have excluded the evidence based on Rule 403, because its probative value was substantially outweighed by its prejudicial effect.

Evidence of uncharged crimes or bad acts "'is not admissible to prove the character of a

person in order to show action in conformity therewith.'" *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (quoting FED. R. EVID. 404(b)). Prior bad acts evidence may, however, be admissible for other purposes. The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *Id.* (quoting *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)).

Brocuglio's complaint alleged that the September 1996 incident prevented him from being able to secure gainful employment, which was a substantial component of his damages analysis. *See* Oct. 4, 1996 Trans. (doc. #127) at 172. Brocuglio opened the door to that issue on direct examination by suggesting that the September 1996 incident was the reason why Brocuglio could not secure gainful employment after September 1996. *See id.* at 104. On cross-examination, defense counsel probed Brocuglio on the question whether it was the September 1996 incident that caused Brocuglio to be unable to retain employment thereafter. *Id.* at 172-73. Brocuglio testified that it was the 1996 incident that prevented him from being able to work in 1999. *Id.* at 173-74. Defense counsel began impeaching Brocuglio by cross-examining him about a specific incident that occurred when Brocuglio was employed with Harley-Davidson in 1999. Brocuglio asserted that he had to stop working at that job, because the nature of the injuries he received during the September 1996 incident prevented him from being physically able to do the work. *Id.* at 174.

At that point, defense counsel requested a conference outside the presence of the jury. Once the jury left the courtroom, defense counsel indicated that he had deposition testimony in which Brocuglio had testified that he had to stop working at Harley Davidson because he was

arrested.  *Id.* at 175.  Defense counsel indicated that he would not question Brocuglio about the

details of the arrest but would merely question him on the fact of the arrest to impeach

Brocuglio's earlier testimony that he had to stop working because of his injuries from the 1996

incident.  *Id.*  at 175-77.

I ruled that the question was one of direct impeachment, and therefore the only issue was

the prejudicial effect it could have.  To alleviate that prejudice, I instructed counsel that

Brocuglio must be given an opportunity to recant his earlier testimony and to indicate that the

reason he stopped working was unrelated to his injuries.  *Id.* at 177.  If he recanted, defense

counsel would not be permitted to cross-examine Brocuglio about the arrest, because there was

no independent relevance to the fact of the arrest.  If Brocuglio did not recant his earlier

testimony, then defense counsel could question him about the fact of arrest for impeachment

purposes only.  I explained:

> Well, there's no relevance, independent relevance to the fact of the arrest . . .
> And so if he's willing to recant his testimony and admit that he stopped this
> work for reasons not related to his health condition, then you've achieved
> what you need to achieve.  I don't think you need to get into the arrest.  If he
> doesn't recant his testimony, then I think it's an appropriate question . . . to
> impeach him.

*Id.* at 177-78.

At that time, Brocuglio's lawyer agreed that it was a reasonable suggestion.  *Id.* at 178.

Brocuglio recanted his testimony, and defense counsel did not question him about the arrest.  *Id.*

at 182-84.  Thus, no questioning about prior arrests occurred in the presence of the jury.  In

addition, a review of the transcript indicates that there is no other instance during Brocuglio's

cross-examination during which counsel referenced prior arrests.

3. *Court's Refusal to Play Unredacted Tape Between Larson and Cooper*

Brocuglio argues that I should have admitted a tape recording between defendants Larson and Cooper.[10] The tape recording apparently contained statements made primarily by Cooper concerning Brocuglio's commitment at Cedar Crest. Brocuglio argued that the statements tended to prove that Brocgulio was railroaded into Cedar Crest by members of the East Hartford Police Department.

Pursuant to Rules 401 and 402 of the Federal Rules of Evidence, I excluded the tape because it was irrelevant. In addition, pursuant to Rule 403, I determined that the evidence was confusing, misleading, and would create undue delay. Brocuglio's counsel argued that the tape was relevant to show that the defendant officers knew that Brocuglio had been set up to go to Cedar Crest and that he was not, in fact, mentally unstable. Therefore, they knew when they went to Brocuglio's home on September 27, 1996 that Brocuglio was not mentally unstable. The problem with that argument, however, is that Brocuglio could not demonstrate that the defendant officers were even aware that the tape recorded conversation had occurred. Therefore, it was irrelevant for the purpose offered. In addition, the fact of the civil commitment was relevant only to show the officers' states of mind with respect to Brocuglio on September 27, 1996; the commitment was otherwise a collateral issue. The introduction of a tape between two non-defendants[11] concerning the events that led up to Brocuglio's civil commitment would have unnecessarily confused the jury. Finally, I allowed Brocuglio to testify on rebuttal that he was

---

[10] In fact, Cooper was not a defendant in the case.

[11] At the time Brocuglio sought to introduce the tape, Larson was no longer a defendant in the case, because I had granted his motion for judgment as a matter of law.

ultimately found to be competent and was released from Cedar Crest, thereby giving Brocuglio the chance to rehabilitate himself with respect to any inference of incompetence.

4.    *Testimony Regarding Lack of Animus Towards Police*

Brocuglio argues that I prohibited him from testifying about his lack of animus towards the police and that he should have been permitted to present testimony to rebut defense counsel's portrayal of him as a person with a consistent history of disputes with the police department.

Brocuglio's history with police arose in the context of Brocuglio asserting that he suffered from nightmares and flashbacks of negative police images, resulting from the September 27, 1996 incident.  On direct examination Brocuglio testified that the September 27, 1996 incident was the cause of the flashbacks.  Defense counsel then cross-examined Brocuglio about other incidents with the police that were unrelated to the September 27, 1996 incident that may have been an alternate cause of the flashbacks.  On re-direct examination, Brocuglio's counsel asked Brocuglio if he was friends with some police officers.  Brocuglio answered that he did have police officer friends and that his niece was a police officer.  Oct. 5, 2005 Trans. at 310.  He then began to drift into another topic, at which point defense counsel objected to the non-responsive nature to the question.  I sustained the objection insofar as it was non-responsive.  I then sustained the objection with respect to further questions concerning Brocuglio's relationship with the police.  The issue on cross-examination was not whether Brocuglio was biased against police, but rather whether there could have been an alternate source of his flashbacks, and hence an alternate cause of his damages.  I permitted limited rehabilitation regarding Brocuglio's police officer friends, but exercised my discretion to limit irrelevant and misleading testimony in that regard.  My decision to limit the amount of testimony regarding Brocuglio's lack of animus

towards the police was not a miscarriage of justice.

**III.     Conclusion**

Brocuglio is not entitled to a new trial because the jury's verdict was not seriously

erroneous or a miscarriage of justice.  Therefore, Brocuglio's Motion for a New Trial (**doc. #**

**157**) is **DENIED**.

It is so ordered.

Dated at Bridgeport, Connecticut, this 23rd day of March 2007.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge